### In re PHILIP SERVICES CORP. SECURITIES LITIGATION

**This Document Relates To: All Actions**

**No. 98 Civ. 0835(MBM).**

United States District Court, S.D. New York.

May 24, 2004.

---

Jeffrey C. Block, Michael T. Matraia, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Co-lead Counsel for Plaintiffs.

Neil L. Selinger, Jeanne F. D'Esposito, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, Co-lead Counsel for Plaintiffs.

Robert H. Bell, John T. Berendt, Marshall R. King, Gibson, Dunn & Crutcher LLP, New York, NY, for Defendant Deloitte & Touche LLP.

Craig Smyser, Smyser, Kaplan & Veselka, LLP, Houston, TX, for Defendant Robert L. Knauss.

Celso M. Gonzalez–Falla, Vinson & Elkins LLP, New York, NY, for Defendant William E. Haynes.

Charles W. Schwartz, Skadden, Arps, Slate, Meagher & Flom LLP, Houston, TX, for Defendant William E. Haynes.

## OPINION AND ORDER

MUKASEY, District Judge.

This opinion and order treats two motions to dismiss a consolidated class action. The action arises out of an announcement of losses and restatement of earnings by Philip Services Corporation ("Philip"), a Canadian metal processing company.

Plaintiffs represent an uncertified class of investors who purchased Philip stock or call options during the proposed class period, or former shareholders of companies whose stock was exchanged for Philip stock. The gravamen of their complaint is that Philip perpetrated a massive fraud upon its shareholders by making various fraudulent misrepresentations concerning the income and value of the company during a three-year period between 1995 and 1998. Plaintiffs have sued, among others, Philip's outside auditor Deloitte & Touche LLP ("Deloitte"), alleging violations of

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (2000), and Rule 10b–5 promulgated thereunder, and Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k (2000); and Philip directors William Haynes and Robert Knauss, alleging violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (2000), Section 11 of the Securities Act, and Section 15 of the Securities Act, 15 U.S.C. § 77o (2000).

All of the defendants named in the action previously moved to dismiss on forum non conveniens grounds. In addition, Deloitte, Haynes and Knauss moved to dismiss the claims asserted against them under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. By previous order, I dismissed the action on forum non conveniens grounds. *See In re Philip Servs. Corp. Sec. Litig.*, 49 F.Supp.2d 629 (S.D.N.Y. 1999). On appeal, the Court of Appeals reversed and remanded for consideration of the motions to dismiss for failure to state a claim. This opinion resolves those motions.

For the reasons set forth below, the motions to dismiss are denied as to all claims, except that Haynes' and Knauss' motion to dismiss the Section 20(a) claim is granted in part.

## I.

Many of the facts underlying this action are set forth in prior opinions issued by the Second Circuit and this court. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir.2002); *DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49 (2d Cir.2000); *In re Philip Servs. Corp. Sec. Litig.*, 49 F.Supp.2d 629 (S.D.N.Y.1999). Familiarity with those opinions is assumed for cur-

rent purposes, and what follows are only those facts relevant to the motions presently under consideration.[1] The facts are either undisputed or presented in the light most favorable to plaintiffs.

Between 1992 and 1997, Philip sought to expand its revenue base, range of services and network of facilities throughout North America. To the extent relevant here, Philip's expansion effort assumed two forms. First, in July 1997, Philip acquired two companies—Allwaste, Inc. ("Allwaste") and Serv–Tech, Inc. ("Serv–Tech")—in stock-for-stock deals worth approximately $560 million. Second, in November 1997, Philip placed secondary stock offerings in the U.S. and Canada (the "November 1997 public offerings"), raising from investors approximately $380 million.

On January 26, 1998, Philip announced it would take charges to earnings for fiscal year 1997 of between $250 and $275 million. Over the next several months, this figure was increased to over $381 million. In addition, Philip restated its financial statements for fiscal years 1995, 1996, and 1997. The restatements showed that Philip had overstated its 1995 earnings by $22.5 million and its 1996 earnings by $48.3 million. After these announcements, Philip's share price dropped from $13 1/8 on January 16, 1998 to $2 9/16 in July 1998, a loss of approximately 80 percent.

Philip's announcements and the drop in its share price loosed a torrent of litigation in the United States and Canada. In the United States, more than 20 class action lawsuits were commenced in various jurisdictions. The Judicial Panel on Multi–District Litigation transferred the cases to this court for coordinated pre-trial pro-

---

**1.** Citations to the record are provided for material facts not set forth in the prior opin- ions.

ceedings.[2] Plaintiffs filed a 157–page, 453–paragraph Consolidated and Amended Class Action Complaint ("Complaint"), alleging numerous fraudulent misrepresentations regarding Philip's financial condition and financial results. The Complaint names as defendants, among others, Deloitte, Haynes and Knauss.

*Claims Against Deloitte*

Deloitte is a member of Deloitte Touche Tohmatsu, a federation of affiliated accountants headquartered in New York City. Deloitte served as Philip's outside auditor beginning in 1990 and for the entirety of the proposed class period. (Compl.¶¶ 83, 282) It staffed and performed the audit of Philip's financial statements from its Mississauga, Ontario, Canada office. (*Id.* ¶ 284) According to the Complaint, the Philip audit engagement was "one of the largest accounts (if not the largest account) handled by the Mississauga office of Deloitte." (*Id.* ¶ 291)

Deloitte issued unqualified or "clean" audit opinions on Philip's financial statements for fiscal years 1995 and 1996. (*Id.* ¶ 286) In both opinions, Deloitte stated that it had conducted the audit "in accordance with auditing standards generally accepted in Canada" and that, in Deloitte's opinion, the financial statements "present fairly, in all material respects, the financial position of the Company" as at year-end, "in accordance with accounting principles generally accepted in Canada." (*Id.* ¶¶ 287, 288; 1995 Philip Annual Report,

Serio Decl. Ex. A ("1995 Report"), at 36; 1996 Philip Annual Report, Serio Decl. Ex. B ("1996 Report"), at 38) Philip included the audit opinions in its Form 40–Fs—annual reports that certain Canadian issuers file with the Securities and Exchange Commission ("SEC") pursuant to Section 13(b) or 15(d) of the Exchange Act of 1934—for fiscal years 1995 and 1996. (*Compl.* ¶¶ 100, 287, 288; 1995 Report at 36; 1996 Report at 38) Moreover, Deloitte agreed to the inclusion of its 1996 audit opinion in the registration statements accompanying the Allwaste and Serv–Tech mergers and the November 1997 public offerings.[3] (*Id.* ¶¶ 125, 286, 386, 411, 433) In connection with the November 1997 registration statement, Deloitte updated its 1996 audit opinion to reflect Philip's compliance, in all material respects, with accounting principles generally accepted in the United States, and confirmed this information as of a week before the November 1997 public offerings. (*Id.* ¶ 289)

The Complaint alleges that the 1995 and 1996 audit opinions were false and misleading because, contrary to its representations, Deloitte knowingly or recklessly failed to disclose Philip's multiple violations of U.S. and Canadian Generally Accepted Accounting Principles ("GAAP") and, in preparing the audit opinions, failed to comply with U.S. and Canadian Generally Accepted Accounting Standards ("GAAS").[4] (*Id.* ¶¶ 4, 167, 230, 270–336)

---

**2.** I consolidated the cases for pre-trial purposes by order dated July 23, 1998. (Docket No. 20)

**3.** Plaintiffs allege occasionally that Deloitte consented to the inclusion of its 1995 *and* 1996 audit opinions in the Allwaste, Serv–Tech, and November 1997 registration statements. (*See, e.g.,* Compl. ¶ 286) However, it appears that the registration statements at issue contain only Deloitte's 1996 audit opin-

ion, although that opinion certified Philip's 1995 and 1996 financial statements.

**4.** GAAP "are the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ('AICPA')," and GAAS "are the standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination." *Sec. &*

The Complaint asserts claims against Deloitte pursuant to Section 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder, and Section 11 of the Securities Act of 1933.

*Claims Against Haynes and Knauss*

Haynes and Knauss were directors of Allwaste before its acquisition by Philip in July 1997, and were appointed directors of Philip on August 6, 1997. (*Id.* ¶¶ 60, 61) Knauss was appointed Chairman of Philip's Board on May 6, 1998. (*Id.* ¶ 60) The Complaint alleges that Haynes and Knauss attended a board of directors meeting at which the participants discussed Philip's improperly recorded earnings for the third quarter of 1997, and then signed the November 1997 registration statement, which made no disclosure that the earnings therein reported were fraudulent. (*Id.* ¶¶ 60–61, 236–238) The Complaint asserts claims against Haynes and Knauss pursuant to Section 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act.

## II.

For purposes of a motion to dismiss, the court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor. *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). Also, for purposes of a Rule 12(b)(6) motion in a securities case, a complaint is deemed to include any statements or documents incorporated in it by reference, as well as publicly disclosed documents required by law to be, and that actually have been, filed with the SEC, and documents the plaintiffs either possessed or knew about and upon which they relied in bringing suit. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citations omitted).

*Exch. Comm'n v. Price Waterhouse*, 797

## III.

As described above, the Complaint alleges multiple claims against Deloitte, Haynes and Knauss under various provisions of the federal securities laws. Each claim will be addressed in turn.

### A. *Section 10(b) of the Exchange Act*

The first claim in the Complaint alleges that Deloitte committed securities fraud in violation of Section 10(b) and Rule 10b–5 promulgated thereunder. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 lists the following among the acts proscribed by Section 10(b): "To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The Second Circuit has held that to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that the defendant: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (citations omitted).

Deloitte moves to dismiss the Section 10(b) claim on the grounds that the Complaint (1) fails sufficiently to allege scien-

F.Supp. 1217, 1222 n. 17 (S.D.N.Y.1992).

ter; and (2) fails to allege fraud with sufficient particularity.

### 1. Pleading Scienter

In order to state a Section 10(b) claim, a plaintiff must allege that defendants acted with scienter, *i.e.*, fraudulent intent. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (finding that the Exchange Act "clearly connotes intentional misconduct" and thus a plaintiff must plead scienter). The Private Securities Litigation Reform Act of 1995 ("PSLRA") codified the scienter requirement and established a pleading standard. Pursuant to that statute, a complaint alleging a Section 10(b) claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ Even before passage of the PSLRA, the Second Circuit interpreted Fed.R.Civ.P. 9(b), which governs fraud claims generally, to require securities fraud plaintiffs to allege facts giving rise to "a strong inference of fraudulent intent." *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994). *See also Sec. & Exch. Comm'n v. KPMG LLP*, 03 Civ. 671(DLC), 2003 WL 21998052, *4, 2003 U.S. Dist. LEXIS 14521, at *10–11 (S.D.N.Y. Aug. 22, 2003) (noting that securities fraud plaintiffs have "long been required to state with particularity 'facts that give rise to a strong inference of fraudulent intent.'") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)). Accordingly, the Second Circuit has ruled that the PSLRA heightened the nationwide pleading standard to the level already used by the Second Circuit. *See Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 104 (2d Cir. 2003); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). Because the PSLRA

effectively codified the existing Second Circuit pleading standard for scienter, I may look to the Circuit's pre-PSLRA body of case law to determine whether plaintiffs sufficiently allege scienter in this case. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000) ("[W]e hold that the PSLRA adopted our 'strong inference' standard.... Therefore, in applying this standard, district courts should look to the cases and factors ..." already established by the Circuit.); *Hart v. Internet Wire, Inc.*, 145 F.Supp.2d 360, 366 (S.D.N.Y. 2001) (noting that "we may apply the standards for scienter that have been developed in this Circuit" in weighing sufficiency of scienter allegations).

■ In the Second Circuit, a plaintiff can generate the requisite "strong inference" of scienter by alleging either of two categories of fact: (1) facts showing that defendants had motive and opportunity to commit fraud; or (b) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted). Either will suffice. *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (citation omitted).

#### a. *Motive and opportunity*

■ Motive is properly alleged by stating " 'concrete benefits that could be realized by one or more of the false statements' " identified in the complaint. *Shields*, 25 F.3d at 1130. Here, the Complaint can be read as alleging two possible motives for Deloitte to commit fraud: (1) Deloitte's desire to receive auditing fees from Philip; and (2) the possibility that certain Deloitte employees would obtain employment with Philip. Neither of these motives, as pleaded, is sufficient to suggest fraudulent intent.

■ Plaintiffs' first theory of motive is that Deloitte made fraudulent misstatements in its 1995 and 1996 audit opinions because it received substantial compensation from serving as Philip's auditor and wished to maintain this profitable relationship. (Plaintiffs' Memorandum of Law in Opposition to Deloitte's Motion to Dismiss ("Pls.' Mem. in Opp'n to Deloitte's Mot. to Dismiss") at 23–26; Plaintiffs' Supplemental Memorandum of Law in Opposition to Deloitte's Motion to Dismiss ("Pls.' Supp. Mem. in Opp'n to Deloitte's Mot. to Dismiss") at 12–13). However, a generalized economic interest in professional fees is insufficient to establish an accounting firm's motive to commit fraud. *See id.* at 1130; *ICD Hldgs. S.A. v. Frankel,* 976 F.Supp. 234, 245 n. 51 (S.D.N.Y.1997) (citing cases). Notwithstanding the financial importance of the Philip account to Deloitte's Mississauga office, it strains reason that Deloitte would jeopardize its reputation, subject itself to civil and/or criminal liability, and risk substantial financial penalties simply because it wanted to keep Philip as a client. *See In re Health Mgmt., Inc. Sec. Litig.,* 970 F.Supp. 192, 202 (E.D.N.Y.1997) (it was not in auditor's economic self-interest to willingly condone fraud to preserve a fee that, though large account in field office, was "minute" relative to all of auditor's accounts); *Duncan v. Pencer,* 94 Civ. 0321(LAP), 1996 WL 19043, **9–10, 1996 U.S. Dist. LEXIS 401, at *32–33 (S.D.N.Y. Jan. 18, 1996) (finding "economically irrational" the claim that a large accounting firm "would condone a client's fraud in order to preserve a fee that, at best, is an infinitesimal percentage of its annual revenues and, by doing so, jeopardize its reputation and license, as well as subject itself to potential damages literally tens of thousands of times as large as its fee"). Absent specific facts warranting a departure from the assumption that Deloitte was acting in its economic self-

interest, I decline to infer fraudulent intent merely from its desire to keep a client.

Plaintiffs argue that, even if Deloitte's interest in earning future revenues from Philip were an insufficient motive, its interest in collecting approximately $1 million in outstanding fees from Philip at the time the November 1997 registration statement was issued is "entirely another" kind of motivation. (Pls.' Mem. in Opp'n to Deloitte's Mot. to Dismiss at 26) But collecting past fees—as opposed to maximizing future revenues—does not present a meaningful distinction in the scienter analysis. Plaintiffs cite no authority making that distinction, nor can I think of any reason why Deloitte would be more inclined to commit fraud to collect past fees than it would to collect future fees. In short, the desire to collect fees, whether prospective or past, can be attributed to practically every professional services firm, and "[s]uch generalized desires do not establish scienter." *Kalnit,* 264 F.3d at 141 (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 814 (2d Cir.1996)).

Plaintiffs next contend that Deloitte's individual employees might be found to have had the requisite motive even if the firm did not: "[W]hile as a matter of organizational behavior theory Deloitte might not want to jeopardize its so-called 'priceless reputation' for a fee, at the individual level, an inference has been created that the temptation was too great for the individual auditor to place Deloitte's informed economic self-interest above his or her own." (Pls.' Mem. in Opp'n to Deloitte's Mot. to Dismiss at 24 n. 11) However, an auditor's participation in a client's fraud is perhaps even more economically irrational at the individual level because of the asymmetry of risks involved: the indi-

vidual auditor shares relatively little of the financial gain from the fraud, but he subjects himself to substantial professional and financial risk. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990) ("[C]overing up fraud and imposing large damages on the partnership will bring a halt to the most promising career. [The auditor's] partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with [the client].").

Plaintiffs' second theory of motive is that Deloitte issued fraudulent audit opinions because, in exchange for doing so, some of its employees were offered and accepted higher-paying jobs from Philip. (Pls.' Mem. in Opp'n to Deloitte's Mot. to Dismiss at 26; Pls.' Supp. Mem. in Opp'n to Deloitte's Mot. to Dismiss at 12) Even presuming an individual auditor's interest in future employment with a client by itself is enough to establish motive, this allegation fails because the Complaint fails to state with any reasonable specificity when Philip made the alleged job offers to Deloitte's employees. Notably, Deloitte was the outside auditor for Philip since 1990 (Compl.¶ 83), but its 1995 and 1996 audit opinions are the only ones at issue in the present litigation. The Complaint alleges merely that Deloitte employees received job offers *"during* the audits of Philip," (*Id.* ¶ 336) (emphasis in original) but does not specify which, if any, of the disputed audits in the present action were involved, or what the role was of particular employees in such audits. Such vague allegations cannot establish that receipt of concrete benefits (the individual auditors' employment with Philip) was linked to alleged false statements (the misstatements in the 1995 and 1996 audit opinions). Accordingly, such allegations cannot support an inference of fraudulent intent.

### b. Circumstantial evidence of conscious misbehavior or recklessness

Although the Complaint fails sufficiently to allege Deloitte's motive to commit fraud, I must consider whether it alleges strong circumstantial evidence of conscious misbehavior or recklessness. Where, as here, plaintiffs fail sufficiently to allege a fraudulent motive, "it is still possible to plead scienter by identifying circumstances indicating conscious misbehavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). Assuming the truth of the allegations, and granting plaintiffs all reasonable inferences, the Complaint sufficiently alleges Deloitte's fraudulent intent under both the conscious misbehavior and recklessness prongs.

#### (i) Conscious misbehavior

■ Conscious misbehavior "is easily identified since it encompasses deliberate illegal behavior." *Novak*, 216 F.3d at 308. The Complaint alleges at least three specific instances of Deloitte's conscious misbehavior:

(1) In 1996, Philip incurred approximately $8 million in losses as a result of its acquisition of the Petrochem S.C. facility in Rockville, South Carolina. While conducting the 1996 audit, Noel Woodsford, the Deloitte audit partner, advised Marvin Boughton, Philip's Executive Vice-President and Chief Financial Officer, and John Woodcroft, Philip's Vice President of Operations, that if Philip characterized the losses as "training expenses," they could be capitalized under GAAP. Boughton and Woodcroft agreed to this suggestion and Woodsford agreed to

sign off on the audit. Deloitte was aware that the Petrochem losses were actual losses, and that Philip had not undertaken any training activities at the Petrochem facility. Deloitte did not have any documentation supporting the characterization of the Petrochem losses as training expenses. (Compl.¶¶ 227–230, 306–310)

(2) In late January or early February 1997, Ronald McNeill, Deloitte's Group Managing Partner, expressed concern about certain "corporate adjustments" made by Philip's accounting office. According to the Complaint, Boughton and Woodcroft would instruct Philip's accounting office to manipulate the financial statements of certain Philip subsidiaries, e.g., by deleting recorded liabilities, such that the company's consolidated results would meet Wall Street analysts' expectations. McNeill informed certain Philip officers that "just because they tell you make an entry does not mean you have to make it." (Id. ¶¶ 167, 311–313)

(3) While conducting the 1996 audit, Deloitte became aware of Philip's practice of recording the revenue of companies it was in the process of acquiring as of the date Philip agreed to the acquisition rather than the closing date. Under U.S. GAAP, the revenues and earnings of acquired companies cannot be consolidated until the date of closing. Nonetheless, Philip's financial statements represented that they were in material compliance with U.S. GAAP. Although Deloitte knew that Philip's method of revenue recognition violated U.S. GAAP, and advised Boughton and Woodcroft that Philip should discontinue the practice, it did not require the company to correct previous entries on its financial statements. (Id. ¶¶ 316–317)

The Complaint alleges that Deloitte, notwithstanding its awareness of these instances of accounting fraud, issued an unqualified opinion on Philip's 1996 financial statements. (Id. ¶ 318)

These allegations show that Deloitte not only had knowledge of, but actively facilitated, Philip's accounting fraud.[5] Such express allegations of deliberate misconduct easily satisfy the standard for pleading scienter. See Suez Equity Investors, L.P. v. Toronto–Dominion Bank, 250 F.3d 87, 100 (2d Cir.2001); Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc., 98 Civ. 4132(DLC), 1999 U.S. Dist. LEXIS 1518, at *10–11 (S.D.N.Y. Feb. 16, 1997).

Deloitte argues that the above allegations omit critical facts necessary to create a strong inference of scienter. (Deloitte's

---

**5.** Deloitte can be held liable under Section 10(b) only for its own misrepresentations concerning Philip's financial statements. Thus, to the extent plaintiffs seek to assert a claim against Deloitte for failing to disclose Philip's alleged misstatements regarding its compliance with U.S. GAAP, that claim fails as a matter of law. See IIT v. Cornfeld, 619 F.2d 909, 927 (2d Cir.1980) (limiting auditor's duty to disclose accurate information under Section 10(b) to statements it certified as accurate); Adair v. Kaye Kotts Assocs., Inc., 97 Civ. 3375(SS), 1998 WL 142353, **8–9, 1998 U.S. Dist. LEXIS 3900, at *30 (Mar. 24, 1998)

(" 'No basis exists in principle or authority ... [to] extend[ ] an auditor's duty to disclose beyond ... [his] representation or certification.' ") (quoting Barker v. Lee County Bank, 1985 U.S. Dist. LEXIS 15986, No. 79 Civ. 2047, 1985 WL 2529, at *13 (N.D.Ill. Sept.13, 1985), aff'd, 797 F.2d 490 (7th Cir.1986) (ellipses in Barker )). Drawing all reasonable inferences in plaintiffs' favor, I read the Complaint to mean that Deloitte violated Section 10(b) in its own right by representing in the November 1997 registration statement that Philip's financial statements complied in all material respects with U.S. GAAP.

Memorandum of Law in Support of its Motion to Dismiss ("Deloitte's Mem.") at 34–35; Deloitte's Reply Memorandum in Further Support of its Motion to Dismiss ("Deloitte's Reply Mem.") at 34–36; Deloitte's Supplemental Memorandum of Law in Support of its Motion to Dismiss ("Deloitte's Supp. Mem.") at 5–6) To the contrary, the allegations specify instances of accounting fraud at Philip of which Deloitte became aware, when Deloitte learned of those practices, which persons at Deloitte became aware of them (excepting the allegation of premature revenue recognition), and how Deloitte participated in the fraud. The scienter allegations are not as precise or descriptively exhaustive as might satisfy Deloitte, and may be dismissed at a later stage in the proceedings, but they are not so vague and conclusory as to justify dismissal at the pleading stage. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir.2000) (noting that although "speculation and conclusory allegations will not suffice, ... 'great specificity' " is not required "provided the plaintiff alleges enough facts to support a 'strong inference of fraudulent intent.' ") (quoting *Stevelman*, 174 F.3d at 84); *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994) (holding that " 'great specificity [is] not required with respect to ... allegations of ... scienter' ... because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind" ') (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987)).

The scienter allegations here go well beyond those that Second Circuit courts have dismissed for lack of particularity. *See, e.g., Shields*, 25 F.3d at 1129 (allegations "that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things" were "so broad and conclusory as to be meaningless") (citation omitted); *Vogel v. Sands Bros. & Co.*, 126 F.Supp.2d 730, 741

(S.D.N.Y.2001) ("[C]onclusory and speculative allegations stating that [defendant] must have known of the violations due to its role as ... investment banker" were insufficient to allege scienter); *Zucker v. Sasaki*, 963 F.Supp. 301, 309 (S.D.N.Y. 1997) (dismissing securities fraud claim where scienter allegations were premised "solely on [the defendant's] status as an auditor"; plaintiff "profer[red] no specific facts as to how or when [the auditor] learned of or recklessly disregarded [its client's] problems and the negative consequences that would ensue from the acquisition[,] ... never state[d] what alleged information was revealed to [the auditor], in what form the information was provided, at what point [the auditor] became aware of it, and from whom [the auditor] received this information"). *Cf. In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 334–35 (S.D.N.Y.2001) (rejecting defendant auditor's argument that "the complaint fails to allege *how* it is that [the auditor] would have been aware" of allegedly illicit practices at client's largest account; "[s]uch specificity is more than Rule 9(b) and the PSLRA demand at this stage in the litigation") (emphasis in original); *In re Health Mgmt.*, 970 F.Supp. at 204 (rejecting defendant's objections that "plaintiffs do not allege that [defendant] had actual knowledge of the implications of the alleged [fraudulent] scheme on particular statements made in [defendant's] filings, that he had actual knowledge of the scope of the scheme, or that he was informed the scheme had been carried out"; "the Court is unaware of any legal precedents requiring that these particulars are necessary to plead scienter under Sections 10(b) and 10b–5").

Deloitte argues that the allegations of conscious misbehavior are insufficient because they can be read in an innocent way. Deloitte contends, for example, that the

allegations concerning the Petrochem facility losses "are no less susceptible to an innocent interpretation, in which Woodsford gave Philip an explanation and/or examples of the kinds of situations in which losses could legitimately be deferred." (Deloitte's Mem. at 36) Likewise, with respect to the. allegations of improper corporate adjustments, Deloitte argues that "all that plaintiffs have alleged . . . is that [Deloitte] knew of proposed adjustments" and that, "to the extent that any adjustments were improper," the allegations in fact suggest that Deloitte caused Philip to remedy its accounting. (*Id.* at 33, 33 n. 17) Such characterizations either contradict the plain meaning of the allegations in the Complaint or rely on convoluted inferences favoring Deloitte. Granting plaintiffs the reasonable inferences to which they are entitled at the pleading stage,[6] the allegations are sufficient to establish Deloitte's conscious misbehavior. *See In re Initial*

*Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 332–33 (S.D.N.Y.2003) (rejecting defendants' efforts to "rewrit[e] the Complaints in a way that they believe favors dismissal"; "[d]efendants must take the Complaints as they are written").[7]

(ii) Recklessness

■ Although recklessness is harder to identify than conscious misbehavior, the Second Circuit has observed that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308. For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must " 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.' " *Rothman,* 220 F.3d at 98 (citation omitted). This standard re-

---

**6.** Some other Circuits have held that the PSLRA's "strong inference" standard for alleging scienter modified the well-established rule granting all reasonable inferences in plaintiff's favor on a motion to dismiss. *See, e.g., Gompper v. VISX, Inc.,* 298 F.3d 893, 896–97 (9th Cir.2002) (noting "inevitable tension . . . between the customary latitude granted the plaintiff on a motion to dismiss under [Rule] 12(b)(6), and the heightened pleading standard set forth under the PSLRA;" concluding that "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs") (emphasis in original); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) (PSLRA's "strong inference" requirement "means that plaintiffs are entitled only to the most plausible of competing inferences"). However, Second Circuit courts have declined to interpret the PSLRA's "strong inference" language so as to deprive plaintiffs of all reasonable inferences at the pleadings stage. *See Kalnit,* 264 F.3d at 137–38 (in case implicating PSLRA, "drawing all reasonable inferences in the plaintiff's favor") (internal quotation marks and citation omitted); *In re Initial*

*Public Offering,* 241 F.Supp.2d at 332 ("Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.") (quoting *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 78 (1st Cir.2002)).

**7.** The allegations of conscious misbehavior discussed in the text above all relate to the 1996 audit opinion and thus are insufficient to allege Deloitte's scienter as to the 1995 audit opinion. *See Podany v. Robertson Stephens, Inc.,* 318 F.Supp.2d 146, 158 (S.D.N.Y. 2004) ("Specific allegations of fraud as to any one opinion . . . is not legally sufficient under § 10(b) to allege fraud as to all opinions published by that defendant. To hold otherwise would declare open season on all opinions issued by [the defendant analyst] even in the absence of the particularized allegations of fraud required by Fed.R.Civ.P. 9(b) and the PSLRA."). However, the allegations of Deloitte's recklessness discussed in the text below relate to both audit opinions at issue and thus are sufficient to establish Deloitte's scienter as to the 1995 opinion.

quires more than the auditor's "mere publication of inaccurate accounting figures, or a failure to follow GAAP." *Vladimir v. Deloitte & Touche LLP*, 95 Civ. 10319(RPP), 1997 WL 151330, *3, 1997 U.S. Dist. LEXIS 3823, at * 10 (S.D.N.Y. Mar. 31, 1997) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994)).

> A plaintiff must prove that ... '[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'

*In re Complete Mgmt.*, 153 F.Supp.2d at 333–34 (quoting *Price Waterhouse*, 797 F.Supp. at 1240).

The Complaint alleges that Deloitte recklessly disregarded various "red flags" indicating Philip's accounting fraud, including: (1) a "highly suspicious" and "massive" increase of Philip's copper inventories during a period of backwardation [8] in the copper markets (*id.* ¶ 320–323); (2) a qualified opinion issued by a former auditor of a Philip subsidiary indicating the difficulty of verifying inventory levels at the subsidiary (*id.* ¶ 325); (3) a letter written by a former Philip employee in 1995 alleging "questionable business practices and material accounting misstatements" at Philip prior to 1994 (*id.* ¶¶ 327–330); (4) Philip's lack of an adequate financial reporting system that would allow it to track financial transactions properly (*id.* ¶ 332); (5) the existence of material unrecorded liabilities that plainly were reflected in certain inventory repurchase contracts entered into by Philip (*id.* ¶ 333); and (6) the "obvious simplicity" of Philip's alleged fraudulent practices. (*id.* ¶ 334).

These multiple allegations of "red flags," considered in the aggregate, support an inference of fraudulent intent adequate to survive a motion to dismiss. "[B]ecause the 'red flags' would be clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the 'red flags,' but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme." *In re Leslie Fay Companies Sec. Litig.*, 871 F.Supp. 686, 699 (S.D.N.Y.1995). *See also In re Complete Mgmt.*, 153 F.Supp.2d at 334; *In re Health Mgmt.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (both finding scienter allegations sufficient where auditor ignored multiple red flags). The enormity of the fraud attributed to Philip makes this finding particularly appropriate. *See In re Leslie Fay Cos. Sec. Litig.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993) ("Alleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness, on the face of the pleading, which compels us to deny defendant's motion.").

Deloitte argues that the recklessness allegations too lack enough specificity to support an inference of fraudulent intent. (Deloitte's Mem. at 38–39; Deloitte's Reply Mem. at 36; Deloitte's Supp. Mem. at 6–7) Here, Deloitte takes two different approaches. First, it singles out certain paragraphs in the Complaint that summarize the more precise allegations described above, and contends that these "general allegations" are insufficiently particular-

[8]. The Complaint defines "backwardation" as a period in which "industry inventory is not sufficient and copper material is not readily available," thus causing the " 'near' future price (*i.e.*, for the next contract month) [to] be greater than the future contract months." (Compl.¶ 263)

476

ized. However, "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole," *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985) (citing *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), and Deloitte cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder. *See Manavazian v. Atec Group, Inc.,* 160 F.Supp.2d 468, 479–80 (E.D.N.Y.2001) (rejecting "with dispatch" argument whereby "[d]efendants simply [found] fault with paragraphs of the complaint that purport to do no more than summarize more specific allegations found elsewhere").

Second, Deloitte contends that the recklessness allegations fail to state what audit procedures Deloitte used, why the procedures were inadequate, and what audit procedures Deloitte should have used in response to the alleged "red flags." However, such facts are peculiarly within Deloitte's knowledge, and thus are not required at the pleading stage. *See In re Leslie Fay,* 835 F.Supp. at 174 ("[T]he specifics of BDO's auditing procedures strike us as the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint.") (citing *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)); *Liberty Ridge LLC v. RealTech Sys. Corp.,* 173 F.Supp.2d 129, 137 (S.D.N.Y.2001) ("[C]ourts should not demand a level of specificity in fraud pleadings that can only be achieved

through discovery.") (citations omitted). *Cf. Vladimir,* 1997 WL 151330, **7–8, 1997 U.S. Dist. LEXIS 3823, at *24–25 (failure to particularize facts concerning auditor's misconduct was "inexcusable ... in light of the fact that plaintiffs' counsel has been in possession of defendant's work papers for three years and has conducted extensive discovery").[9]

In sum, the allegations in the Complaint create a strong inference of Deloitte's conscious misbehavior and recklessness, and do so with sufficient particularity to withstand dismissal. Although plaintiffs "may have a long road ahead to substantiate their allegations" of fraudulent intent, *In re Leslie Fay,* 871 F.Supp. at 699, the allegations reasonably support the requisite strong inference at this stage in the litigation.

### 2. Pleading Fraud With Particularity

A securities fraud complaint must also plead with particularity the circumstances constituting the alleged fraud. The Second Circuit has interpreted Rule 9(b) to require that a securities fraud complaint: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (citing *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989)). Likewise, the PSLRA requires that a complaint "specify each statement alleged to

9. Deloitte appears at times to conflate the specificity requirements for pleading scienter with those required for pleading the circumstances constituting fraud. It argues, for example, that plaintiffs' scienter allegations "simply do not satisfy the 'who, what, when, where, and how' requirements of Rule 9(b) and Section 21D of the PSLRA," citing *DiLeo,* 901 F.2d at 627. In the passage from *DiLeo* that Deloitte cites, however, the Seventh Cir-

cuit was addressing whether the plaintiffs in that case alleged the circumstances constituting fraud with sufficient particularity to satisfy Rule 9(b); the Court addressed separately whether the plaintiffs had sufficiently alleged scienter. *See id.* at 629. As discussed in the text above, plaintiffs have alleged scienter with sufficient particularity. I consider the sufficiency of plaintiffs' fraud allegations in the text below.

have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts* on which that belief is formed." 15 U.S.C. § 78u–4(b)(1) (hereinafter, "paragraph (b)(1)") (emphasis added).

■ Deloitte argued in its initial motion papers that, because the Complaint relies exclusively on information and belief, plaintiffs' failure to name certain "relevant witnesses" they interviewed in preparing the Complaint is an additional ground for dismissing the Section 10(b) claim. (Deloitte's Mem. at 41–43; Deloitte's Reply Mem. at 37–38) In essence, Deloitte contended that the phrase "all facts" in paragraph (b)(1) described above requires a securities fraud complaint to name the sources of allegations based on information and belief. In a later submission to the court, Deloitte's counsel conceded that, after its initial motion papers were filed, the Second Circuit considered and rejected that argument in *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.2000). (2/13/04 King Letter) However, Deloitte insists that the Complaint fails in other respects to satisfy the pleading standard for fraud allegations outlined in *Novak* and required under the PSLRA. (*Id.;* Deloitte's Second Supplemental Memorandum of Law in Further Support of its Motion to Dismiss, Addressing the Impact of *Novak v. Kasaks, passim;* Deloitte's Reply Memorandum of Law Addressing the Impact of *Novak v. Kasaks, passim* )

In *Novak,* the plaintiffs, shareholders in a public corporation, alleged that the corporation and some of its officers had artificially inflated the price of the corporation's stock. The district court found the pleadings insufficiently particularized, in large part because the plaintiffs failed to name the sources of some of their critical allega-

tions. On appeal, the Second Circuit vacated the district court's decision, noting that, "notwithstanding the use of the word 'all,' paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak,* 216 F.3d at 313. The Court explained the "illogical results" of reading the word "all" in paragraph (b)(1) literally:

> [I]t would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.

*Id.* at 314 n. 1. It noted also that neither Second Circuit precedent nor the language of the PSLRA requires plaintiffs to reveal anonymous sources at the pleading stage, and observed that the purpose underlying paragraph (b)(1)—to afford a defendant fair notice of the plaintiff's claim and the factual ground on which it is based—"can be served without requiring plaintiffs to name their confidential sources as long they supply sufficient facts to support their allegations." *Id.* at 314. Accordingly, the Court announced the following method for evaluating whether confidential source material meets the PSLRA particularity requirement:

> Where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are de-

scribed in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. In both of these situations, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Id.* at 314. The Court then observed that "a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Id.*

While *Novak* categorically rejected the notion that securities fraud complaints must name confidential sources as a general matter, it was rather less precise about what types of "other facts" may satisfy the particularity requirement of paragraph (b)(1). Several district courts in the Second Circuit have interpreted *Novak* narrowly to hold that, although plaintiffs need not name their confidential sources, they nevertheless must provide a description of the sources, either documentary or personal, of their information and beliefs allegations to survive dismissal. *See, e.g., In re MSC Indus. Direct Co., Inc. Sec. Litig.*, 283 F.Supp.2d 838, 847 (E.D.N.Y.2003); *Fadem v. Ford Motor Co.*, 02 Civ. 0686(CSH), 2003 WL 22227961, *7, 2003 U.S. Dist. LEXIS 16898, at *23 (S.D.N.Y. Sept. 24, 2003); *In re Globalstar Sec. Litig.*, 01 Civ. 1748(SHS), 2003 WL 22953163, *7, 2003 U.S. Dist. LEXIS 22496, at *19–20 (S.D.N.Y. Dec. 12, 2003).

I decline to read *Novak* that narrowly for several reasons. First, as the Second Circuit itself acknowledged in *Novak*, paragraph (b)(1) "requires plaintiffs to plead only facts and makes no mention of the sources of these facts." 216 F.3d at 313. Moreover, the opinion states that a complaint "can" satisfy the PSLRA's par-

ticularity requirement by identifying documentary or personal sources; it does not require that a complaint do so. *Novak*, 216 F.3d at 314. Indeed, as the Second Circuit noted, the purposes of paragraph (b)(1) "can be served as long as [plaintiffs] supply sufficient facts to support their allegations." *Id.* For example, the level of factual specificity or the corroborative nature of other facts alleged in a securities fraud complaint might be enough to place defendants on notice of the misconduct alleged and permit them to defend against the charge. *See Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1101–02 (10th Cir.2003). Last, requiring plaintiffs to identify the sources of their factual allegations would, in effect, compel them to plead evidence in their complaint, thereby undoing the principle of notice pleading that underlies the Federal Rules of Civil Procedure. *See id.* at 1101 (noting that although the PSLRA requires securities fraud plaintiffs to allege certain facts with greater precision, it "did not ... purport to move up the trial to the pleadings stage"); *In re Cephalon Sec. Litig.*, 96 Civ. 0633, 1997 WL 570918, *2, 1997 U.S. Dist. LEXIS 13840, at *2 (E.D.Pa. Aug. 29, 1997) ("Clearly, the [PSLRA] requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim."). Had the Second Circuit chosen to interpret the PSLRA as importing an evidentiary requirement into securities fraud complaints, it would have done so more explicitly. *See Kinder–Morgan*, 340 F.3d at 1101.

For the above reasons, I believe *Novak* should not be read to require that securities fraud complaints identify documentary or personal sources. Instead, I join a handful of courts that read *Novak* as endorsing a broader approach to the particularity requirement of paragraph (b)(1).

*See, e.g., In re Cabletron Sys., Inc.,* 311 F.3d 11, 29–30 (1st Cir.2002); *In re Initial Public Offering,* 241 F.Supp.2d at 358–59. *See also Kinder–Morgan,* 340 F.3d at 1101–03 (declining to adopt position, attributed to *Novak,* that PSLRA requires securities fraud complaint to identify sources of allegations based on information and belief).[10] Under this approach, the court looks to whether the factual allegations, considered in the whole, "provide an adequate basis for believing that the defendants' statements were false," *Novak,* 216 F.3d at 314, without adding the requirement that the complaint identify the source of the factual allegations. This interpretation of *Novak* recognizes, as I believe the Second Circuit did, that requiring disclosure of sources in all securities fraud complaints is too restrictive a response to the PSLRA's particularity requirement.

*In re Cabletron Systems,* one of the cases cited above that adopts a broader reading of *Novak,* addressed what types of "other facts" might satisfy the particularity requirement of paragraph (b)(1). In that case, the First Circuit endorsed the following approach for resolving whether fraud allegations satisfy the particularity requirement of paragraph (b)(1):

> The approach we take, similar to *Novak,* is to look at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.' *Novak,* 216 F.3d at 314. This involves an evaluation, *inter alia,* of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allega-

tions, the number of sources, the reliability of the sources, and similar indicia.

*In re Cabletron,* 311 F.3d at 29–30. *See also Kinder–Morgan,* 340 F.3d at 1102–03 (recommending that courts consider, *inter alia,* coherence, plausibility and specificity of the allegations, whether sources are disclosed and reliability of those sources, and "any other factors that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading"). Thus, while the disclosure of sources may strengthen a complaint pleaded on information and belief, it is not necessary if the facts otherwise support a reasonable belief that the alleged fraud occurred. In short, "[w]hat facts and what level of particularity are sufficient to support a plaintiff's beliefs will vary from case to case.... The critical threshold is that the allegations must be made in a way that satisfies the court that plaintiff's charge of fraud is not 'unwarranted.'" *In re Initial Public Offering,* 241 F.Supp.2d at 359.

■ In the present case, the factual allegations describing Deloitte's role in the alleged fraud are sufficiently numerous and detailed to meet the particularity requirement of paragraph (b)(1). To take one example, the allegations concerning the Petrochem losses specify the division of Philip at which the improper accounting occurred (the Petrochem facility), people at Deloitte and Philip complicit in the fraud (Woodsford, Boughton, and Woodcroft), and the amount of the losses at issue ($8 million). "Overall, the accumulated amount of detail the [Complaint] provides tends to be self-verifying; these are

---

**10.** In *Kinder–Morgan,* the Tenth Circuit interpreted *Novak* as requiring securities fraud complaints to describe the personal or documentary sources of allegations based on information and belief, and purported to adopt a different, less rigid approach to the PSLRA's

particularity requirement. For the reasons described in the text, I decline such an interpretation of *Novak,* and believe that the Tenth Circuit's "alternative" approach to evaluating the sufficiency of fraud allegations is consistent with the language of the *Novak* opinion.

not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred...." *In re Cabletron Sys.*, 311 F.3d at 30. Such particularized allegations "provide an adequate basis for believing that [Deloitte's] statements were false," and make it unnecessary for plaintiffs to disclose the sources of their beliefs at the pleading stage.

In sum, the Complaint alleges sufficient facts on which plaintiffs' beliefs are formed to satisfy the PSLRA's particularity requirement. Viewed in their entirety, the allegations put Deloitte on fair notice of plaintiffs' claims and their factual basis. Accordingly, the Complaint is "not frivolous or conclusory and deserves to proceed to the next stage of litigation." *Kinder-Morgan*, 340 F.3d at 1105.

### B. *Section 11 of the Securities Act*

The third, sixth, and ninth claims are asserted against Deloitte, Haynes and Knauss under Section 11 of the Securities Act. Section 11 permits an action by any person who acquired a security in reliance on a registration statement that contained a material misstatement, as against, among others,

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(4) every accountant ... who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him....

15 U.S.C. § 77k(a).

■ Because intent to defraud is not an element of a Section 11 claim, " 'only a material misstatement or omission [in a registration statement] need be shown to establish a prima facie case....' " *In re Initial Public Offering*, 241 F.Supp.2d at 343 (citation omitted). *See also In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 306 (E.D.N.Y.2002) ("[A] plaintiff does not need to allege the manner in which a material misstatement on a securities filing was made—innocently, negligently, fraudulently or otherwise—because Section 11 provides for strict liability.") (citation omitted). However, the Second Circuit has ruled recently that, where Section 11 (or Section 12(a)(2)) claims are based on underlying allegations of fraud, the complaint must satisfy the heightened pleading requirements of Rule 9(b). *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir.2004).

In *Rombach*, the Second Circuit noted that although fraud "is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," those claims "may be—and often are—predicated on fraud," and that the allegations underlying Section 10(b) claims and Section 11 claims are often the same. *Id.*[11] The Court observed that the considerations for applying Rule 9(b) to a conventional fraud claim "apply

---

**11.** The Second Circuit noted also that "a plaintiff need allege no more than negligence to proceed under Section 11...." 355 F.3d at 171. Given the well-settled interpretation of Section 11 as a strict liability provision and the lack of further discussion in *Rombach* about whether to read a state of mind requirement into Section 11 generally, I decline to interpret the decision as introducing a state of mind element for Section 11 claims absent underlying fraud allegations.

with equal force" to Section 11 (or Section 12(a)(2)) claims sounding in fraud. *Id.* (citation omitted). Accordingly, it held that the heightened pleading standards of Rule 9(b) apply to Section 11 (or Section 12(a)(2)) claims insofar as such claims as premised on underlying allegations of fraud. *Id.* As discussed above, the Second Circuit has interpreted Rule 9(b) to require that a securities fraud complaint allege, *inter alia,* facts giving rise to "a strong inference of fraudulent intent" and state with particularity the facts constituting the alleged fraudulent conduct.

Applying *Rombach,* I must consider whether plaintiffs' Section 11 claims sound in fraud and, if so, whether the underlying allegations of fraud satisfy the pleading requirements of Rule 9(b). I examine the claims against Deloitte, and Haynes and Knauss separately, because the facts underlying those claims vary significantly.

### 1. Deloitte

The Complaint asserts Section 11 claims against Deloitte based on its consent to the republication of the "false and misleading" 1996 audit opinion in the November 1997, Allwaste, and Serv–Tech Registration Statements. Deloitte seeks dismissal of the Section 11 claims on the ground that they are premised on fraud allegations and fail to satisfy Rule 9(b)'s heightened pleading requirements. (Deloitte's Supp. Mem. at 7–9; Deloitte's Supplemental Memorandum of Law in Further Support of its Motion to Dismiss, dated 1/20/04, *passim;* Deloitte's Reply Memorandum of Law Concerning the Impact of *Rombach v. Chang, passim* )

■ Plaintiffs argue at the threshold that Deloitte waived any objections to the Section 11 claims because (1) Deloitte conceded the sufficiency of the Section 11 claims in its initial set of motion papers and raised its objections for the first time in a supplemental memorandum that the parties had agreed was meant only to address recent case law with respect to pleading standards under the PSLRA; and (2) Deloitte should not be permitted to circumvent Fed.R.Civ.P. 12(g), which bars a party from submitting more than one pre-answer motion to dismiss under Rule 12(b). (Plaintiffs' Reply to Deloitte's Supplemental Memorandum of Law in Support of its Motion to Dismiss at 1–3; Plaintiffs' Second Supplemental Memorandum of Law in Opposition to the Motions of Deloitte, Haynes and Knauss ("Pls.' 2d Supp. Mem. in Opp'n to the Motions of Deloitte, Haynes and Knauss") at 4–5) Neither argument has merit. First, I am not bound by the terms of a stipulation between parties to a dispute. *See United States ex rel. Terry v. Henderson,* 462 F.2d 1125, 1131 n. 13 (2d Cir.1972); *Am. Fed. of State, County and Municipal Employees, AFL–CIO v. New York,* 599 F.Supp. 916, 919 n. 1 (S.D.N.Y.1984). Second, because I have not yet ruled on that part of Deloitte's motion to dismiss based on failure to state a claim, Deloitte's "newly-raised" objections as to the Section 11 claims cannot properly be characterized as a second pre-answer motion to dismiss. Accordingly, this court has jurisdiction to consider Deloitte's objections to the Section 11 claims.

Turning to the merits of Deloitte's objections, it is plain that the Section 11 claims asserted against it sound in fraud: not only do allegations of Deloitte's fraud permeate the Complaint, but also the claims asserted under Section 11 are premised on the allegations supporting the Section 10(b) claim against Deloitte. (*See, e.g.,* Compl. ¶ 386 ("Deloitte consented to the inclusion of its auditor's opinions in the Registration Statement. Deloitte's audit opinions with respect to Philip's 1995 and 1996 financial statements were false and

misleading when the November 1997 Registration Statement was declared effective by the SEC.")) Accordingly, Rule 9(b) applies. *See Rombach,* 355 F.3d at 172 (applying Rule 9(b) where "the wording and imputations of the complaint are classically associated with fraud"); *In re Ultrafem, Inc. Sec. Litig.,* 91 F.Supp.2d 678, 690 (S.D.N.Y.2000) (applying Rule 9(b) where "plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint"). However, because I have already found, in connection with the Section 10(b) claim, that those underlying allegations are sufficiently pleaded to satisfy Rule 9(b) and the PSLRA, Deloitte's motion to dismiss the Section 11 claims on this ground is denied.

Deloitte argues as a fallback position that it cannot be held liable under Section 11 for misstatements in the registration statements attributable to parties other than Deloitte. (Deloitte's Mem. at 43–44) I do not read the Complaint to assert Section 11 claims against Deloitte for misstatements made by other parties, and plaintiffs have verified in their papers that they will pursue Section 11 claims against Deloitte only for misstatements that it prepared or certified. (Pls.' Mem. in Opp'n to Deloitte's Mot. to Dismiss at 38) Nevertheless, to the extent Deloitte seeks assurance that it cannot be held liable under Section 11 for information in the registration statements it did not prepare or certify, the terms of the statute provides ample guidance: an accountant may be held liable only for statements that "purport [ ] . . . to have been prepared or certified by him." 15 U.S.C. 77(k)(a)(4). *See also Herman & MacLean v. Huddleston,* 459 U.S. 375, 386 n. 22, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (holding that accountants "cannot be reached by a Section 11 action . . . with respect to parts of registration statement

which they are not named as having prepared or certified").

### 2. Haynes and Knauss

██ The Section 11 claim against Haynes and Knauss is based on their having signed the November 1997 registration statement in their capacity as Philip directors. According to the Complaint, Haynes and Knauss, among others, attended a board of directors meeting at which the participants discussed Philip's improperly recorded earnings for the 1997 third quarter amounting to $ 24.2 million. (Compl.¶¶ 236–238) Nevertheless, Haynes and Knauss later signed the November 1997 registration statement, which did not disclose the fraudulent nature of the earnings. (*Id.* ¶¶ 60–61, 238) Plaintiffs concede that their Section 11 claim against Haynes and Knauss sounds in fraud, but argue that the underlying allegations satisfy the heightened pleading requirements of Rule 9(b). (Pls.' 2d Supp. Mem. in Opp'n to the Motions of Deloitte, Haynes and Knauss, *passim;* Plaintiff's Reply Memorandum of Law in Further Opposition to the Motions to Dismiss of Haynes and Knauss, *passim* )

Haynes' and Knauss' principal objection is that the Complaint does not sufficiently allege their participation in making the fraudulent statements in the November 1997 registration statement, and thus fails to plead fraud with sufficient particularity under Rule 9(b). (Haynes' and Knauss' Memorandum of Law in Support of their Motion to Dismiss ("Haynes' and Knauss' Mem.") at 18–19; Haynes' and Knauss' Supplemental Memorandum of Law in Support of their Motion to Dismiss ("Haynes' and Knauss' Supp. Mem.") at 13–14; Haynes' and Knauss' Second Supplemental Memorandum of Law in Support of their Motion to Dismiss ("Haynes' and Knauss' 2d Supp. Mem.") at 3) The

Second Circuit has held that, in order to satisfy the fraud particularity requirement of Rule 9(b), a complaint must "inform each defendant of the nature of his or her alleged participation in the fraud." *DiVittorio*, 822 F.2d at 1247 (citation omitted). However, plaintiffs here are relieved of the burden of having to identify the specific roles of Haynes and Knauss in the alleged fraud under the so-called "group pleading doctrine." That doctrine applies where, as here, the directors or officers of a company participate in the preparation and dissemination of group-published documents, such as registration statements. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (noting that "group-pleading doctrine allows plaintiffs to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company'") (citation omitted); *Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180, 1188 n. 7 (S.D.N.Y.1996) ("The defendants ... protest that the Amended Complaint fails to specify the particular omission attributable to each of the Individual Defendants. When an alleged fraudulent omission occurs in an offering memorandum filed with the SEC signed by each of the Individual Defendants, however, there is no requirement that the complaint be any more particular to comply with Rule 9(b) in this respect.") (citing *DiVittorio*, 822 F.2d at 1247).

That Haynes and Knauss were outside directors of Philip and were appointed to the company's board only three months before issuance of the November 1997 registration statement is of no consequence because, as the Complaint alleges, they had access to insider information concerning Philip's improperly recorded earnings for the 1997 third quarter. *See Sperber*

*Adams Assocs. v. JEM Mgmt. Assocs. Corp.*, 90 Civ. 7405(JSM), 1992 WL 138344, *2, 1992 U.S. Dist. LEXIS 8301, at *5 (S.D.N.Y. June 4, 1992) (outside director who prepared and distributed offering materials is insider for purposes of Rule 9(b) particularity inquiry); *Schnall v. Annuity and Life Re (Holdings), Ltd.*, 3:02 Civ. 2133(GLG), 2004 WL 231439, *4, 2004 U.S. Dist. LEXIS 1601, at *11 (D.Conn. Feb. 4, 2004) ("[O]utside directors, although almost by definition excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider.") (citing *In re XOMA Corp. Sec. Litig.*, C–912252, 1990 WL 357807, *6, 1991 U.S. Dist. LEXUS 20051, at *6) (N.D.Cal. Dec. 27, 1991). Notwithstanding Haynes' and Knauss' assertion to the contrary, the enactment of the PSLRA did not undermine the group pleading doctrine in the Second Circuit. *See In re Complete Mgmt.*, 153 F.Supp.2d at 326 n. 7 (citing *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 442 (S.D.N.Y.2000)); *In re Oxford Health Plans*, 187 F.R.D. at 142.

Haynes and Knauss argue that the Section 11 claim should be dismissed also because the Complaint fails to allege facts creating a strong inference of their fraudulent intent. (Haynes' and Knauss' Mem. at 18; Haynes' and Knauss' 2d Supp. Mem. at 3) However, the Complaint alleges that Haynes and Knauss attended a board meeting at which the participants were told about Philip's improperly recorded earnings for the 1997 third quarter, but they nevertheless executed the November 1997 registration statement. Such allegations are enough to sustain a strong inference at the pleading stage that Haynes and Knauss knowingly committed securi-

ties fraud by signing that registration statement.

Haynes and Knauss ask the court in the alternative to strike from the Complaint any claim against them of joint and several liability because, they argue, the PSLRA requires plaintiffs asserting joint and several liability claims under Section 11 to allege defendants' knowing violation of the securities laws, and plaintiffs fail to do so here. (Haynes' and Knauss' 2d Supp. Mem. at 3–5) This argument fails on two grounds. First, the statute that Haynes and Knauss cite in support of this argument concerns the level of scienter that the "trier of fact" must find in order for a defendant to incur joint and several liability; it has no bearing on plaintiffs' minimum pleading requirements. *See* 15 U.S.C. § 78u–4(f)(3)(A) ("Any covered person against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws."). Second, even presuming the statute were applicable at this stage in the litigation, for the reasons discussed above, the Complaint sufficiently alleges facts creating a strong inference that Haynes and Knauss knowingly committed securities fraud.

C. *Section 20(a) of the Exchange Act and Section 15 of the Securities Act*

The second and fifth claims assert "control person" liability claims against Haynes and Knauss under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. In effect, the Complaint alleges that Haynes and Knauss, as Philip directors, held power and influence over the company's actions and, therefore, are liable for its fraudulent misrepresentations.

*Section 20(a) of the Exchange Act*

■ Section 20(a) imposes liability on "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder …, unless the controlling person acted in good faith and did not … induce the … violation." 15 U.S.C. § 78t(a). In order to state a prima facie claim under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998) (quoting *Sec. & Exch. Comm'n v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)).

Plaintiffs' allegations in furtherance of the Section 20(a) claim, though sparse, are sufficient to avoid dismissal. The first element is satisfied with the allegation that Philip committed multiple violations of Section 10(b) of the Exchange Act. (Compl.¶¶ 369–376) Because no party has challenged the sufficiency of that allegation, I assume that plaintiffs have adequately pleaded a primary violation. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77–78 (2d Cir.), *cert. denied*, 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001) (primary violation element of a Section 20(a) claim was satisfied where plaintiffs adequately pleaded Section 10(b) claim).[12]

12. In their initial brief, Haynes and Knauss contend that plaintiffs should not be permitted to circumvent the pleading requirements of a Section 10(b) claim by instead bringing a Section 20(a) claim against them. (Haynes' and Knauss' Mem. at 2) However, whether or not plaintiffs bring a Section 10(b) claim against *Haynes and Knauss* is irrelevant to the Section 20(a) analysis. To assert a Section 20(a) claim against Haynes and Knauss, plaintiffs must allege that a controlled person (here, Philip, not Haynes and Knauss) com-

To establish the second element—control—a plaintiff must show that the defendant "possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey Securities,* 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2). "A short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which [that claim] rests ... is all that is required." *Schnall,* 2004 WL 231439, *9, 2004 U.S. Dist. LEXIS 1601, at *25 (citing *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) and *In re Initial Public Offering,* 241 F.Supp.2d at 352).

■ Haynes' and Knauss' status as directors, standing alone, is insufficient to establish their control over Philip. *See Food & Allied Service Trades Dep't, AFL–CIO v. Millfield Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994) ("While courts in this circuit have not always agreed on just how much beyond status as a director must be alleged to plead a Section 20(a) claim, ... they have agreed that a bare allegation of director status, without more, is insufficient."); *In re CINAR,* 186 F.Supp.2d at 309 ("It is well accepted that merely alleging that a particular defendant is a director or an officer of a company is not sufficient to allege control.") (citations omitted). However, the Complaint alleges not only that Haynes and Knauss were directors of Philip, but also that they signed the November 1997 registration statement. (Compl.¶¶ 60–61) While there

is case law suggesting that a defendant's execution of a fraudulent SEC filing is insufficient by itself to establish control, *see Jacobs v. Coopers & Lybrand,* 97 CIV. 3374, 1999 WL 101772, **17–18, 1999 U.S. Dist. LEXIS 2102, at *51 (S.D.N.Y. Feb. 26, 1999) (citing cases), I share the view that it "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." *Id. See also In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 772 (S.D.N.Y.2001) (allegations that defendants were directors, held substantial equity stake in company and signed prospectus were sufficient to establish control); *In re Quintel Entm't Sec. Litig.,* 72 F.Supp.2d 283, 298 (S.D.N.Y.1999) (allegations that defendants had "access to [the company's] internal reports, press releases, public filings, and had the ability to prevent the issuance or correct the statements" were sufficient to establish control). That Haynes and Knauss were required by law to sign the November 1997 registration statement, far from absolving them of responsibility for the misstatements therein, "charges [them] with power over the document[ ] and represents to the corporation, its shareholders, and the public that [they have] performed [their] role with sufficient diligence that [they are] willing and able to stand behind the information contained in [the] document[ ]." *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 420 (S.D.N.Y.2003). *See also In re Livent,* 151 F.Supp.2d 371, 437 (S.D.N.Y.2001) ("An outside director and audit committee member who is in a position to approve a

---

mitted a Section 10(b) violation. *See Suez Equity Investors, L.P.,* 250 F.3d at 101 ("Controlling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of

the fraud."); *In re Initial Public Offering,* 241 F.Supp.2d at 392 n. 178 ("Primary liability of the controlling person is not a necessary predicate to a section 20(a) claim. Section 20 is typically used to sue defendants who do not have primary liability.").

corporation's financial statements can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation, at least insofar as the 'management and policies' referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign.") (quoting 17 C.F.R. § 240.12b–2).

The Second Circuit has not defined the phrase "culpable participation"—the third element—other than to say that "a determination of section 20(a) liability requires an individual determination of a ... defendant's particular culpability." *Boguslavsky,* 159 F.3d at 720, and district courts in the Circuit are split as to what exactly the phrase means. Some district courts assume that "culpable participation" requires proof of state of mind, and thus conclude that plaintiffs must allege the controlling person's scienter to state a prima facie Section 20(a) claim. *See, e.g., In re Oxford Health Plans,* 187 F.R.D. at 143; *In re Deutsche Telekom AG Sec. Litig.,* 00 Civ. 9475(SHS), 2002 WL 244597, *6, 2002 U.S. Dist. LEXIS 2627, at *17–18 (S.D.N.Y. Feb. 20, 2002); *Mishkin v. Ageloff,* 97 Civ. 2690(LAP), 1998 WL 651065, **22–24, 1998 U.S. Dist. LEXIS 14890, at *67–72 (S.D.N.Y. Sept. 23, 1998). Other district courts have reasoned that there is no basis for equating "culpable participation" with scienter, so that plaintiffs asserting a Section 20(a) claim need allege only an underlying primary violation and control person

status. *See, e.g., In re Initial Public Offering,* 241 F.Supp.2d at 394 n. 182 (noting that culpable conduct "can be blameworthy though it was done unintentionally or unknowingly" and that "the scienter-free definition of 'culpable' is particularly appropriate when it modifies 'participation,' which means 'to take part in something (as an enterprise or activity) usually in common with others.'") (citations omitted).[13] I need not resolve this debate because, even assuming "culpable participation" entails scienter, plaintiffs have pleaded it here.

If scienter is an element of a Section 20(a) claim, the PSLRA's pleading requirements apply, and plaintiffs must plead with particularity facts giving rise to a strong inference that the control person knew or should have known that the primary violator was engaging in fraudulent conduct. *See Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452, 484 (S.D.N.Y.2001); *In re Deutsche Telekom,* 2002 WL 244597, **7–8, 2002 U.S. Dist. LEXIS 2627, at *22 (citations omitted). Here, the Complaint sufficiently alleges Haynes' and Knauss' scienter by asserting that (1) they attended a board meeting at which participants discussed Philip's improperly recorded earnings for the third quarter of 1997, and (2) they later signed the November 1997 registration statement that reported the false earnings. (Compl.¶¶ 236–238) Haynes and Knauss may prefer a more particularized description of what was dis-

---

**13.** Such is the propensity among certain courts to equate "culpable participation" with scienter that ordinarily they do not even use the term "scienter" and the intra-circuit debate is framed as one over whether "culpable participation" is a required element of a Section 20(a) claim. *See, e.g. Burstyn v. Worldwide Xceed Group, Inc.,* 01 Civ. 1125(GEL), 2002 WL 31191741, *7, 2002 U.S. Dist. LEXIS 18555, at *22 (S.D.N.Y. Sept. 30, 2002) ("The district courts in this Circuit have divided as to the prima facie requirements of a

Section 20(a) claim, or more specifically as to whether plaintiffs must plead culpable participation."). However, as noted in the text above, the Second Circuit has held that a plaintiff must plead culpable participation in order to state a Section 20(a) claim. *See Boguslavsky,* 159 F.3d at 720. Therefore, the debate is properly understood not as whether "culpable participation" is a requirement of a Section 20(a) claim, but what the phrase "culpable participation" means.

cussed at the board meeting and their states of mind with respect to those discussions, but such facts are peculiarly within Haynes' and Knauss' own knowledge, and plaintiffs should not be expected to plead them in the Complaint.

█ Haynes and Knauss next contend that the Section 20(a) claim should be dismissed because plaintiffs seek to hold them jointly and severally liable to class members who purchased Philip's stock before Haynes and Knauss became associated with the company, and thus before they had the requisite control status for Section 11 liability. (Haynes' and Knauss' Supp. Mem. at 12) I agree that Haynes and Knauss cannot be held liable under Section 20(a) for Philip's misconduct during that part of the class period before they acquired control status, *see Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 873 F.Supp. 111, 120 (N.D.Ill.1995) ("[C]ontrol person liability attaches only to a person who was in control at the time that the liability of the controlled person accrued, not to someone who later takes control.") (citing 9 Louis Loss & Joel Seligman, *Securities Regulation* 4472 (3d ed.1992)); *Adair v. Hunt Int'l Resources Corp.,* 79 Civ. 4206, 1982 U.S. Dist. LEXIS 11045, at *10–11 (N.D.Ill. Feb. 22, 1982) (declining to ascribe control person status to defendants who acquired ownership interests in company after complained-of transactions occurred), but plaintiffs' failure to particularize in the Complaint Haynes' and Knauss'

proportional liability does not warrant dismissal of the entire Section 20(a) claim.[14] Instead, that claim is dismissed only insofar as it is premised on Haynes' and Knauss' liability for Philip's fraudulent conduct before August 7, 1997, the date on which they became directors of the company.[15] Haynes' and Knauss' motion to dismiss the Section 20(a) claim is otherwise denied.

### Section 15 of the Securities Act

Section 15 of the Securities Act attaches liability to "every person who, by or through stock ownership, agency, or otherwise, . . ., controls any person liable under Section 11, or 12, . . ., unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. Plaintiffs asserting a Section 15 claim must plead an underlying primary violation of Section 11 (or Section 12(a)(2)) of the Securities Act and control over the primary violator by the targeted defendant. *See In re Initial Public Offering,* 241 F.Supp.2d at 352 (citation omitted). However, as with control person liability claims under Section 20(a) of the Exchange Act, district courts in the Second Circuit are split over whether plaintiffs asserting Section 15 claims must plead scienter (what courts generally refer to as "culpable participation"). *See In re Asia Pulp & Paper Sec. Litig.,* 293 F.Supp.2d 391, 395–96 (S.D.N.Y.2003); *In re CINAR,*

---

**14.** To the extent Haynes and Knauss assert that the PSLRA requires plaintiffs to plead with particularity outside directors' proportional liability, that assertion is baseless. The portion of the PSLRA relating to "proportionate liability," 15 U.S.C. § 78u–4(f), requires the trial court to instruct the jury to make ultimate findings concerning the proportional liability of outside directors; nothing in that provision requires plaintiffs to allege the extent of Haynes' and Knauss' proportional liability at the pleading stage. *See also* 15

U.S.C. § 78u–4(f)(1) ("Nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws.").

**15.** Plaintiffs do not allege any independent basis for inferring Haynes' and Knauss' control in the period before they became directors of Philip.

186 F.Supp.2d at 309–10; *Dorchester Investors v. Peak Trends Trust,* 99 Civ. 4696(LMM)(FM), 2003 WL 223466, *3, 003 U.S. Dist. LEXIS 1446, at *10–11 (S.D.N.Y. Feb. 3, 2003) (all citing cases).[16] Again, I need not resolve the intra-circuit debate because, even if scienter is required, all three elements of a Section 15 claim are sufficiently pleaded here. The Complaint alleges that Philip committed violations of section 11 of the Securities Act in relation to the November 1997 public offerings (Compl.¶¶ 382–391), and no party has challenged the sufficiency of those allegations. Moreover, as discussed above in connection with the Section 20(a) claim, plaintiffs have sufficiently alleged Haynes' and Knauss' control status and their "culpable participation" in Philip's fraud. Accordingly, Haynes' and Knauss' motion to dismiss the Section 15 claim is denied.

\* \* \* \* \* \*

For the reasons stated above, Deloitte's motion to dismiss is denied as to all claims. Haynes' and Knauss' motion to dismiss is denied as to all claims except that their motion to dismiss the Section 20(a) claim is granted insofar as the claim is based on their liability for underlying primary violations occurring before August 7, 1997.

SO ORDERED:

---

**16.** Some courts holding that plaintiffs asserting a Section 15 claim need not plead "culpable participation" have reasoned that, because the requisite underlying Section 11 (or Section 12(a)(2)) violation sounds in strict liability and does not require defendants' knowledge of the misrepresentations, it makes "little sense to compel plaintiffs to allege a culpable state of mind in order to state a claim under Section 15." *In re CINAR,* 186 F.Supp.2d at 310 (citing *In re Indep. Energy Holdings,* 154 F.Supp.2d at 770 and *In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 208 (E.D.N.Y.2000)). *See also In re Sterling Foster & Co. Sec. Litig.,* 222 F.Supp.2d 216, 282 (E.D.N.Y.2002); *In re Deutsche Telekom AG,* 2002 WL 244597, **5–6, 2002 U.S. Dist. LEXIS 2627, at *16–17.* I need not decide whether I agree, though I note that the Second Circuit's recent decision in *Rombach,* discussed in the text above, casts at least some doubt on its continued force in cases where the underlying Section 11 (or Section 12(a)(2)) claim is based on fraud.